Filed 12/6/22  P. v. Washington CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHNNIE LEE WASHINGTON et al.,<br><br>    Defendants and Appellants. | B305402<br><br>Los Angeles County<br>Super. Ct. No. TA142617 |

APPEALS from judgments of the Superior Court of Los Angeles County.  Patrick E. Connolly, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Johnnie Lee Washington.

Joshua L. Sigel, under appointment by the Court of Appeal, for Defendant and Appellant Aneesah Hughes.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Jarrett Grace.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

———————

A jury convicted Johnnie Lee Washington, Aneesah Hughes, and Jarrett Grace of numerous crimes—including first degree murder, conspiracy to murder, attempt to murder, and assault with a firearm—after finding they shot three of Washington's ex-girlfriends and killed his unborn child. On appeal, the defendants argue the trial court made evidentiary, instructional, and sentencing errors, there is insufficient evidence supporting some of their convictions, and the jury improperly convicted them of both murdering and attempting to murder the same victim. We agree with the defendants on the latter issue and conclude the court made sentencing errors in Hughes's and Grace's cases. We affirm the judgments in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The charges*

The People charged Washington, Hughes, and Grace (together, Defendants) with conspiracy to murder and attempted murder of Ywainesha Taylor and Storm Reeves (Pen. Code, §§ 664, 187, subd. (a), 182, subd. (a)(1)),[1] murder and attempted murder of Reeves's fetus (§§ 664, 187, subd. (a)), and assault with a firearm on Brejae Washington, Javaree Clayton, and Octavia Mercadale (§ 245, subd. (a)(2)). The People also charged Hughes with attempted murder of Iman Miller (§§ 664, 187, subd. (a)).

---

[1] Future undesignated statutory references are to the Penal Code.

The People alleged various firearm and gang allegations as to all three defendants.

The People presented evidence at trial showing the following.

## 2.     *January 29, 2017 attempted murder of Iman Miller*

Defendant Washington and Iman Miller started "hooking up" in November 2016.  Washington was dating defendant Hughes at the time.  Although Washington dated many women, Hughes was his "main" girlfriend.

Miller and Hughes ran into each other one night in December 2016.  Hughes threw a drink on Miller and challenged her to a fight.  Miller agreed, and they fought at a nearby high school.  Miller got the better of the fight.  Later that night, Hughes intentionally drove her car into Miller's car, ramming it three times.

After the fight, Hughes posted messages on social media saying she had been pregnant, but Miller caused her to miscarry by kicking her in the stomach.  Hughes repeatedly called Miller and sent her messages challenging her to another fight.  In one exchange at the end of December 2016, Hughes told Miller to "drop a location" for a fight.  Miller replied, "You just mad I beat the baby outta you, now bye bitch, be mad at that."  Miller eventually gave Hughes a location for them to fight.  Hughes went to the location, but Miller was not there.

On January 29, 2017, Miller drove to St. Andrews Park. She stopped her car in the parking lot and started talking to some people, including defendant Grace.  Grace and Washington were friends and members of the Eight Tray Gangsters.

At some point, Miller saw Hughes drive into the parking lot.  Hughes stopped her car, and Washington got out of the

3

passenger-side door. Miller immediately left the park and started driving home because she "didn't want any problems."

On her way home, Miller noticed Hughes driving behind her very closely. Hughes followed Miller for about a mile. Hughes then pulled her car to the side of Miller's car, rolled down her window, and fired three to four gunshots in Miller's direction. One of the bullets grazed Miller's leg. Hughes drove away without saying anything.

Miller got out of the car and ran to a nearby house. Sometime later, Hughes drove past the house slowly and made eye contact with Miller. Hughes again did not say anything.

3. ***February 21, 2017 attempted murder of Ywainesha Taylor, and assaults with a firearm on Brejae Washington, Javaree Clayton, and Octavia Mercadale***

Washington and Ywainesha Taylor dated for six years. In 2014, they had a son, Jayveon.

In August 2014, Washington went to Taylor's house, took her phone, and threatened to shoot her and everyone else in the house. In April 2015, Washington severely beat Taylor. Washington and Taylor broke up that same year, but they continued to have sex.

On February 13, 2017, Hughes sent Taylor a number of messages challenging her to a fight. Taylor replied that if Hughes wanted to fight because Washington was unfaithful, she would be fighting for the rest of her life. Taylor also implied she had sex with Washington the night before.

A few hours later, Hughes sent Taylor a message asking, " '[w]hen can I see my kid,' " apparently referring to Jayveon. Taylor replied with a sarcastic remark referencing Hughes's

4

recent miscarriage. Hughes again asked to see Jayveon, and Taylor told her she could see the child when "you can finally push one out."

About a week later, on February 21, Taylor's mother, Octavia Neil, told Taylor that Washington called and wanted to take their child, Jayveon. Taylor refused. Hughes and Taylor then had an argument about seeing the child.

Later that day, around 2:00 p.m., Washington and a man wearing a "T" hat and glasses showed up at Neil's apartment. Hats with the letter "T" are common attire for members of the Eight Tray Gangsters. Washington claimed Taylor told him to take Jayveon. Neil called Taylor, who was at a county building, and asked if Washington was allowed to take the child. Taylor said no, which Neil relayed to Washington. Washington said he would wait for Taylor outside. According to Neil, Washington was not angry or upset.

Around the time Washington left Neil's apartment, a security guard saw Washington, Grace, and a man wearing red pants become verbally aggressive with a male resident of the apartment complex. Washington and the man wearing red pants lifted up their shirts, showing they each had a gun. The guard told the men the police were on their way; Washington, Grace, Hughes, and the man wearing red pants got into a black SUV and drove off.

A surveillance video from the apartment complex shows Washington, Grace, Hughes, and a man with red pants walking toward the resident. Grace has his hands near his waist, but no gun is visible. At some point, Grace, Washington, Hughes, and the other man turn around and quickly walk away from the apartment.

Around this time, Taylor left the county building in Brejae Washington's gray car. Brejae[2] was driving and Taylor was sitting in the front passenger seat; Javaree Clayton and Octavia Mercadale were sitting in the backseat. The plan was to stop somewhere and then go to Taylor's mother's apartment.

Phone records show Washington and Brejae called each other ten times between 1:58 p.m. and 2:30 p.m. While Brejae was driving, someone else called her and asked, "[T]his you in front of us?" Taylor then received a social media message asking, " 'Is that you in the gray car?' "

After reading the message, Taylor looked around and saw a black SUV pull alongside the passenger side of Brejae's car. Washington was driving, and Hughes was sitting in the front passenger seat. There were about four men in the backseat, but Taylor did not recognize them. One of the men in the backseat pointed a gun at Brejae's car. He was wearing a black shirt and a hat with a "T" on it.

Washington and Hughes told Taylor to pull over. Hughes grabbed the steering wheel and directed Washington to "shoot [them]." Washington started shooting a gun, and his car "wiggled." One of the bullets struck Taylor in the right buttock and traveled into her left buttock. Taylor tried to crawl into the backseat to escape the gunfire. She heard approximately seven shots. There were two bullet holes in the front passenger-side door of Brejae's car. Brejae sped up, and Washington followed her for a while. Brejae eventually drove to a probation office to ask for help.

---

[2]     For the sake of clarity, we refer to Brejae Washington by her first name.

Taylor later told a detective she had an app on her phone that allowed other people with iPhones to view her location, which she believed Washington had used to locate her in Brejae's car.

**4.     *February 23, 2017 attempted murder of Storm Reeves and murder of her fetus***

a.     *Events leading up to the shooting*

Storm Reeves met Washington when she was 16 years old, and they started having sex off and on. Around August 2016, Reeves confronted Hughes about hooking up with Washington behind her back. About a month later, Reeves discovered she was pregnant with Washington's child, and she immediately shared the news with Hughes.

In September 2016, Hughes posted a message on social media stating someone had set her car on fire. Although Reeves denied responsibility, she posted a message taking credit for it in order to upset Hughes and Washington. Reeves also posted a message disrespecting Hughes's gang and challenging her to a fight.

Around December 30, 2016, Hughes posted a message on social media saying, " 'The last bitch that I just fought made me lose my baby. And see where Storm [Reeves] at, cuz she next.' " Reeves interpreted the message to be a threat to her unborn child.

In late January 2017, Washington told someone, "[Reeves's] a gon[ ]er." Around the same time, Hughes said she was trying to " 'catch' " Reeves. At some point, Washington sent Reeves a message saying, "[You] heard what happened to Iman [Miller]. 100K[,]"and "Don't let me catch [you]."

7

Around this time, Grace started sending Reeves messages claiming he wanted to have a romantic relationship with her. Reeves had previously met Grace through Washington, and they were friendly with each other. Reeves, however, thought it was "weird" that Grace was contacting her, as he knew she was on bad terms with Washington. Grace asked Reeves for her address and said she could trust him. At the time, Reeves was living in San Bernardino. She gave Grace a fake address.

On February 3, 2017, Washington asked Grace about Reeves and said it was " 'serious' " because Grace was the only person in contact with her. Grace responded that Reeves wanted him to visit her, but " 'that's out.' " Grace asked Washington, " '[W]hat you want me to do?' " Washington replied: " 'I don't care. Cap her or something.' " " 'Uk. Gotta be on her necc.' " Grace responded, " 'That's what I'm asking you.' " Washington, " 'Yea.' " Grace, " 'Owekilla.' "

The feud between Reeves, Hughes, and Washington escalated in February 2017 after Reeves posted Hughes's mother's address on social media. Hughes responded by posting a request for help finding out where Reeves was living. Hughes wrote, "I want that bitckh. [¶] It's a lot been going on. [¶] I caught the bitckh Iman [Miller] and all."

Hughes made several other requests for help locating Reeves. On February 13, 2017, for example, a man sent Hughes a message asking if her car had been set on fire. Hughes responded, " '[Laughing my ass off.] Yeah.' " Hughes then asked the man to " '[t]ry to find out where [the woman who did it] live.' " Hughes told the man to " '[a]ct like you want to fuck with her.' " Around the same time, Hughes told someone else to " 'get coo[l] with Storm [Reeves], so you can find out where she live.' "

8

Hughes said, " '[A]ct like you don't like me, if she ever ask about me.' "

In mid-February, Washington told Reeves he wanted to see her, but Reeves refused. Reeves brought up the fact that she burned Hughes's car, and she told Washington that Hughes should fight her.

Around this time, Reeves and Hughes exchanged numerous messages trying to arrange a fight. During one exchange, Reeves said, " 'I blew yo car up. Come for me.' " Hughes responded, " 'You didn't blow my car up.' " Hughes told Reeves to " '[c]ome to Vernon and 65th' " to fight, to which Reeves replied, " 'Bitch, I still ain't lost my baby.' "

Around February 17, 2017, Reeves posted a message on social media saying she would target anyone who threatened to hurt her kids, and anyone helping the person making the threats. She also posted messages disrespecting Washington's mother and gang, and stating Washington, Hughes, and their families could not see her baby.

The same day, Washington told Grace to " '[s]ee where Storm's at.' " Grace responded, " 'Okilla.' " Grace then called Reeves.

b.    *The shooting*

After exchanging messages with Grace for several weeks, Reeves finally agreed to meet him in person early in the morning of February 23, 2017. Grace reassured her she was safe with him and he would not let Washington or Hughes touch her. Reeves was seven months pregnant at the time.

Reeves's friend agreed to drive her from San Bernardino to Los Angeles. At 12:31 a.m., Grace sent Reeves a message asking where she was. Reeves replied she was on her way and would

tell him when she was outside.  Grace asked which direction she was coming from, and Reeves responded, " 'Down Fig.' "  When Grace sent the messages, phone records show he, Washington, and Hughes were all in the same area, near Washington's house.

A few minutes later, Reeves's friend dropped her off a short distance from 77th and Raymond, which is where Grace told her to meet him.  Reeves saw Grace waiting and started walking toward him.  As she approached, Grace said, "Eight Tray Gangsters," and a car "rolled up" from the opposite direction.

Reeves gave varying accounts of what happened next.  Initially, she told detectives that Hughes was driving the car and Washington was the passenger.  Hughes got out of the car, and Reeves started "talking shit," trying to instigate a fight.  Hughes went back to the car and grabbed a gun.  She shot Reeves in her stomach and passed the gun to Washington, who shot Reeves in her back and mouth.

Reeves gave a different account at the preliminary hearing.  She testified that, after Hughes shot her in the stomach, Grace chased her down and tried to " 'finish [her] off.' "  She said she was certain Grace shot her in the mouth.[3]

At trial, Reeves gave yet another account of the shooting.  She testified that Washington was driving the car and Hughes was the passenger.  When Reeves saw them, she said, " 'What's up?  You wanna fight?  You threaten my baby.  What's the

_____

[3]    At trial, Reeves claimed she was not "in [her] right mind" at the preliminary hearing.  The investigating detective testified Reeves was experiencing serious medical problems at the time.  According to the detective, on the way to the hearing, she repeatedly said she did not want to testify and did not want to be a "snitch."

10

deal?' " Hughes responded from inside the car, " 'Bitch, I don't give a fuck about none of that, and all this.' " They argued back and forth.

At some point, Hughes stopped talking and got out of the car. Hughes was holding a gun and shot Reeves in the stomach multiple times. Reeves turned and started running, and she heard Washington say, "Give it to me, give it to me. Come here. Come here. Go. Go. Go. You done." Someone then shot Reeves twice in the back and once in the buttock, and she fell to the ground. Washington walked up to her and shot her in the mouth. Reeves blacked out.

Around this time, a neighbor woke up to the sound of three loud bangs. He looked outside and saw a man struggling to pick up something. A dark SUV with LED lights pulled up and a male voice said, " 'Come on. Hurry up. Let's go.' " The man who was struggling got in the passenger side of the SUV, which drove away. The man was carrying some type of clothing.

Reeves suffered serious injuries but survived. Doctors delivered Reeves's fetus by an emergency C-section, but the fetus was already dead. The fetus did not suffer any trauma, and the coroner opined the fetus died because of the gunshot wounds to Reeves.

Police executed a search warrant at Washington's apartment, and they discovered a black SUV parked in the rear of the complex. Inside the SUV, police found Washington's identification card, debit card, and medical card. Hughes's fingerprints were on the passenger-side visor mirror. There was an irregularly shaped bloodstain in the backseat, which contained Reeves's DNA. In addition, the SUV's headlights matched those that the neighbor saw the night of the shooting.

11

The police arrested Grace about a month after the shooting, and they put him in a jail cell with an undercover *Perkins*[4] agent. Grace implied to the agent that Washington and Hughes shot Reeves in the stomach. Grace also told the agent he "put the whole play in motion." We discuss Grace's statements to the *Perkins* agent in more detail below.

**5.     *Verdicts and sentences***

The jury convicted Washington of attempted premeditated murder of Taylor (count 1), conspiracy to murder Taylor (count 5), first degree murder of Reeves's fetus (count 6), attempted premeditated murder of Reeves's fetus (count 13), attempted premeditated murder of Reeves (count 7), conspiracy to murder Reeves (count 8), and three counts of assault with a firearm on Brejae, Clayton, and Mercadale (counts 10, 11, and 12). The jury found true allegations that Washington and a principal personally discharged a firearm causing great bodily injury or death to Taylor, Reeves, and Reeves's fetus (§ 12022.53, subds. (d), (e)(1)), and that he personally used a firearm during the assaults (§ 12022.5, subd. (a)).

The jury convicted Hughes of conspiracy to murder Taylor (count 5), first degree murder of Reeves's fetus (count 6), attempted premeditated murder of Reeves's fetus (count 13), attempted premeditated murder of Reeves (count 7), conspiracy to murder Reeves (count 8), and attempted premeditated murder of Iman Miller (count 9). The jury found true allegations that Hughes and a principal personally discharged a firearm causing great bodily injury or death to Reeves and Reeves's fetus (§ 12022.53, subds. (d), (e)(1)), and that Hughes personally

---

[4]      *Illinois v. Perkins* (1990) 496 U.S. 292, 297.

discharged a firearm at Miller (§ 12022.53, subd. (c)).  The jury found Hughes not guilty of attempted murder of Taylor (count 1) and the assault charges (counts 10, 11, and 12).  It also found not true the firearm allegations related to the conspiracy to murder Taylor.

The jury convicted Grace of conspiracy to murder Taylor (count 5), first degree murder of Reeves's fetus (count 6), attempted premeditated murder of Reeves's fetus (count 13), attempted premeditated murder of Reeves (count 7), and conspiracy to murder Reeves (count 8).  The jury found all the firearm allegations not true.  It also found Grace not guilty of attempted murder of Taylor (count 1) and the assault charges (counts 10, 11, and 12).

As to all the defendants, the jury either found not true or deadlocked on the gang enhancement allegations.

The trial court sentenced Washington to an aggregate term of 21 years and eight months, plus 150 years to life.[5]  It sentenced Hughes to an aggregate term of 20 years plus 107 years to life.[6]  It sentenced Grace to an aggregate term of 75 years to life.[7]

---

[5]	The court sentenced Washington as follows:  on counts 5, 6, and 8, three terms of 25 years to life plus three consecutive terms of 25 years to life for the firearm enhancements (§ 12022.53, subd. (d)); on count 10, three years plus 10 years for the firearm enhancement (§ 12022.5, subd. (a)); and on counts 11 and 12, two terms of one year plus two terms of three years and four months for the firearm enhancements (§ 12022.5, subd. (a)).  The court stayed the sentences on counts 1, 7, and 13 under section 654.

[6]	The court sentenced Hughes as follows:  on count 5, 25 years to life plus a consecutive 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)); on counts 6 and 8, two

Defendants timely appealed.

## DISCUSSION

1. ***The trial court was not required to instruct the jury to determine the number of conspiracies***

Defendants argue the trial court erred by failing to instruct the jury to consider whether their agreements to murder Taylor and Reeves were part of a single, overarching conspiracy, rather than two separate conspiracies.

"A conspiracy exists where two or more people agree to commit a crime, they specifically intend both to agree and to commit the crime, and one of them performs an overt act in furtherance of their agreement. (§§ 182, subd. (a)(1), 184.)" (*People v. Kopp* (2019) 38 Cal.App.5th 47, 83 (*Kopp*).) Because the "essence of the crime of conspiracy is the agreement, . . . it is the number of the agreements (not the number of the victims or number of statutes violated) that determine[s] the number of the conspiracies." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669 (*Meneses*).)

" 'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to

---

terms of 25 years to life; and on count 9, seven years to life plus 20 years for the firearm enhancement (§ 12022.53, subd. (c)). The court stayed the sentences on counts 7 and 13 under section 654.

[7] The court sentenced Grace to three consecutive terms of 25 years to life on counts 5, 6, and 8. It stayed the sentences on counts 7 and 13 under section 654.

14

achieving a single unlawful end or result." ' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims." (*Meneses, supra*, 165 Cal.App.4th at p. 1672.)

Although there is a split of authority on the issue, "[m]ost decisions, including the most recent cases, have held that the trial court has a duty to instruct the jury to determine the number of conspiracies committed where there is evidence to support alternative findings." (*Kopp, supra*, 38 Cal.App.5th at p. 84.)

In *People v. Jasso* (2006) 142 Cal.App.4th 1213, for example, a jury convicted the defendant of three counts of conspiracy to import drugs based on evidence showing he made several phone calls to a single contact, who then arranged for three women to attempt to smuggle drugs into a prison. Each attempt was unsuccessful. (*Id.* at pp. 1215–1220.) On appeal, the defendant argued the trial court should have instructed the jury to decide whether there was a single conspiracy instead of three separate conspiracies. (*Id.* at p. 1220.) The court agreed, concluding the evidence could have supported a finding of a general, all-inclusive conspiracy aimed at achieving a single, unlawful result: smuggling drugs into prison. (*Id.* at p. 1221.) The court noted the alleged conspiracies occurred during the same narrow time frame, they involved the same modus operandi, and there was evidence indicating the failed attempts were efforts by the defendant to test his contact in the hopes of forming an ongoing business relationship. (*Ibid.*)

The court in *Kopp, supra*, 38 Cal.App.5th 47, similarly concluded a trial court erred by failing to instruct the jury to determine the number of conspiracies. In that case, the evidence showed the defendants agreed to murder one witness and dissuade another witness from testifying in a separate assault case. (*Id*. at pp. 57–60.) The People charged the defendants with two conspiracies—one for each victim—yet argued in closing that both were part of a larger, uncharged conspiracy to prevent the ordinary administration of justice. (*Id*. at pp. 86–87.) In concluding the trial court had a duty to instruct on the number of conspiracies, the reviewing court noted both alleged conspiracies involved the same overall goal (to ensure key witnesses did not testify in the assault case), the same conspirators, the same overt acts, and overlapping evidence. (*Id*. at pp. 87–88.) The court concluded that, "considering the prosecutor's closing argument, the evidence of the conspiracies, and the alleged overt acts, this seems to be one of those unique cases wherein it is apparent that only one conspiracy existed." (*Id*. at p. 88.)

Here, unlike in *Jasso* and *Kopp*, the record does not support a finding that Defendants' individual agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. Defendants fail to point to any evidence even suggesting they hoped to achieve some greater end by murdering both Taylor and Reeves. Instead, it is apparent the murders themselves were the desired ends. Defendants insist the jury could have found they formed a single conspiracy to eliminate Washington's ex-girlfriends (or, at least, the ex-girlfriends who were causing them trouble). The elimination of Washington's ex-girlfriends, however, is nothing more than

a summation of the individual crimes that Defendants agreed to commit; it does not constitute the sort of "single unlawful end or result" that is required to find an overarching conspiracy.

Nor do any other relevant factors support a finding that Defendants formed a single, overarching conspiracy. The record shows Defendants targeted the victims at different locations and times, using different modus operandi, and for different reasons. Defendants, for example, tracked down Taylor in the middle of the day and shot her from a moving car. In contrast, they lured Reeves under false pretenses to a desolate location late at night before shooting her at close range while on foot. The evidence further shows Defendants were motivated by separate feuds with each victim. Although those feuds concerned similar issues—e.g., access to Washington's children, the victims' sexual relationships with Washington, and Hughes's miscarriage—there is nothing to suggest Defendants believed Taylor and Reeves were jointly responsible for them.

On the record before us, no reasonable juror could have concluded Defendants' agreements to murder Taylor and Reeves were part of a single, overarching conspiracy. Therefore, even if trial courts generally have a duty to instruct juries to determine the number of conspiracies, the court was not required to give such an instruction in this case.

## 2. *The trial court did not prejudicially err by instructing the jury on lying-in-wait murder*

The trial court instructed the jury it could find Defendants guilty of first degree murder of Reeves's fetus under two theories: (1) the murder was committed by lying in wait, or (2) the murder was willful, deliberate, and premeditated. Defendants argue the court should not have instructed on the lying-in-wait theory

because one cannot lie in wait for a fetus as a matter of law. Washington alternatively argues the court should not have given the instruction because there is insufficient evidence showing he was lying in wait for the fetus.

We need not decide whether the court erred because, even assuming it did, the error was harmless beyond a reasonable doubt. As to all three defendants, the jury found true allegations that the murder of Reeves's fetus was "willful, deliberate, and premeditated, setting the count as a First Degree Murder . . . ." Washington and Hughes do not challenge the sufficiency of the evidence supporting those findings and, as we discuss below, substantial evidence supports the finding as to Grace. As a result, beyond a reasonable doubt, the jury relied on a valid theory to convict Defendants of first degree murder. Any instructional error, therefore, was harmless. (See *People v. Avila* (2009) 46 Cal.4th 680, 709 [potentially erroneous lying-in-wait instruction was harmless where the jury unanimously found the murders were willful, deliberate, and premediated].)

Grace concedes the verdicts provide "a conclusive showing that the jury relied on premeditation." Nevertheless, he argues that, because the verdict forms state the finding " 'set[s] the count as a First Degree Murder,' " and because the verdict forms did not give the jury the option of finding true an allegation of lying in wait, it is possible some jurors agreed to the premeditation allegation because it "made no difference" and there was no reason to "waste time trying to figure out if they all agreed on premeditation." This is pure speculation and does not create a reasonable doubt as to whether any error was harmless.

18

**3.** ***The trial court was not required to instruct the jury on heat-of-passion voluntary manslaughter***

Washington and Hughes argue the trial court erred by failing to instruct the jury on heat-of-passion voluntary manslaughter and attempted manslaughter as lesser included offenses of murder and attempted murder. Hughes separately argues the court erred by failing to instruct the jury on conspiracy to commit manslaughter based on a heat-of-passion theory.

    a.    *Background*

During a discussion of jury instructions, Washington requested that the court instruct the jury with CALCRIM No. 570 on heat-of-passion voluntary manslaughter. He argued there was "great provocation by Ms. Reeves, to extend over a long time period, including tormenting the defendant about the miscarriage, offensive comments in general, the potential burning of the car, the claiming of the burning of the car, that all amounts to something a jury could find as sufficient provocation to reduce it from a murder to a manslaughter." Grace added, "also there should be an instruction that provocation that doesn't justify manslaughter should reduce a first [to a] second, that should include, under [Washington's counsel's] theory of drip, drip, drip."

The court declined to instruct the jury on heat-of-passion manslaughter, explaining there is not substantial evidence to reduce murder to manslaughter. The court did not rule on the request for an instruction on provocation, nor did it give such an instruction.

b.	*Relevant law*

A court trying a criminal case must instruct on general legal principles relevant to the issues raised by the evidence and necessary for the jury to understand the case, including lesser included offenses. (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*).) To justify a lesser included offense instruction, substantial evidence—evidence from which a reasonable jury could conclude the facts supported the instruction—must appear in the record. (*Ibid.*)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) When a defendant intentionally and unlawfully kills or attempts to kill in a heat of passion in response to a provocation by the victim, the defendant lacks malice and is guilty only of voluntary manslaughter, which is a lesser included offense of murder. (*People v. Lasko* (2000) 23 Cal.4th 101, 104.)

Heat-of-passion voluntary manslaughter has both objective and subjective components. (*Enraca, supra*, 53 Cal.4th at p. 759.) To satisfy the objective component, the victim's behavior must have been provocative enough to cause an ordinary person with an average disposition to act rashly or without deliberating or reflecting. (*Ibid.*) The provocation "may comprise a single incident or numerous incidents over a period of time. [Citations.]" (*People v. Le* (2007) 158 Cal.App.4th 516, 528.)

To satisfy the subjective component, the evidence must show the defendant was actually under the influence of a strong passion induced by the victim's objectively provocative conduct, and acted with passion rather than judgment. (*Enraca, supra*, 53 Cal.4th at p. 759.) "The passion aroused can be anger, rage, or any violent, intense, highly wrought or enthusiastic emotion,

20

except revenge." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481 (*Wright*).) It "must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)

"[I]n a murder case, unless the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger, it is the *defendant's* obligation to proffer some showing on these issues sufficient to raise a reasonable doubt of his guilt of murder." (*People v. Rios* (2000) 23 Cal.4th 450, 461–462.)

  c.  *Murder of Reeves's fetus*

The trial court did not err in failing to instruct the jury on heat-of-passion manslaughter with respect to the killing of Reeves's fetus. As Hughes concedes, there is no such crime as manslaughter of a fetus. (See *People v. Valdez* (2005) 126 Cal.App.4th 575, 580.) Accordingly, manslaughter is not a lesser included offense of murder of a fetus.

Hughes nevertheless contends the court had a duty to instruct the jury that provocation could negate malice, thereby precluding it from finding her guilty of any crime against the fetus. Hughes, however, overlooks the requirement that "the provocation which incites the killer to act in the heat of passion case must be caused by the victim or reasonably believed by the accused to have been engaged in by the decedent." (*People v. Lujan* (2001) 92 Cal.App.4th 1389, 1411–1412 (*Lujan*); see *People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253 [the objective component of heat of passion requires provocation by the victim].) Here, there is no evidence from which the jury could have concluded Reeves's fetus provoked Defendants, or that

21

Defendants reasonably believed that to be the case. Indeed, a fetus is simply not capable of the sort of provocation required to negate malice.

We reject Hughes's contention that, under the doctrine of transferred intent, any defense to the attempted killing of Reeves would transfer to the killing of her fetus.[8] The People did not rely on a theory of transferred intent or argue that Reeves's fetus was an unintended victim. Instead, the prosecution proceeded under the theory that Defendants specifically intended to kill both Reeves and her fetus. Consistent with the prosecution's chosen theory, the trial court did not instruct the jury on the doctrine of transferred intent. Hughes's transferred intent arguments, therefore, are wholly irrelevant. In any event, as we discuss below, there is insufficient evidence that Hughes was acting under the heat of passion when she attempted to murder Reeves. Accordingly, there was no heat-of-passion "defense" to transfer.

d. *Conspiracies to murder Taylor and Reeves*

Hughes argues the trial court had a duty to instruct the jury that, if it found she was acting under the heat of passion when she conspired to kill Taylor and Reeves, it must find

---

[8] The doctrine of transferred intent provides that, if a defendant intends to kill one victim but mistakenly kills another, the defendant's intent is "deemed to transfer" from the intended victim to the unintended victim. (*People v. Bland* (2002) 28 Cal.4th 313, 317, 320–321.) Under those circumstances, any defenses or theories that would reduce the defendant's culpability with respect to the intended victim also transfer to the unintended victim. (*People v. Mathews* (1979) 91 Cal.App.3d 1018, 1023.)

her guilty of conspiracy to commit manslaughter, rather than conspiracy to commit murder.

Initially, the parties dispute whether there is such a crime as conspiracy to commit manslaughter. In *People v. Horn* (1974) 12 Cal.3d 290 (*Horn*), the California Supreme Court held a conspiracy to kill "*could* take the form of conspiracy to commit first degree murder, conspiracy to commit second degree murder, and conspiracy to commit manslaughter." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1233 (*Cortez*).) Nearly 25 years later, the high court disapproved *Horn* and held there is no crime of conspiracy to commit second degree murder; instead, "all conspiracy to commit murder 'is necessarily "conspiracy to commit [premeditated] first degree murder." ' " (*Cortez*, at pp. 1226, 1233–1234.) Although *Cortez*'s reasoning arguably also precludes the crime of conspiracy to commit manslaughter, the court did not expressly decide the issue. We also need not decide the issue because, even assuming there is a crime of conspiracy to commit manslaughter, the trial court was not required to instruct on it in this case.

In *Horn*, the Supreme Court explained that whether a defendant conspires to commit manslaughter, as opposed to murder, turns on the defendant's mental state at the time of the agreement. The court reasoned that, "[i]f, gripped by mental illness, intoxication, or heat of passion, a man kills without malice, he commits manslaughter; it necessarily follows that if this same man, under those same circumstances, conspires to kill, he conspires to commit manslaughter. Even though his befuddled brain still possesses the bare capacity to agree to the conspiracy, his inability to appreciate the gravity of his act, or to harbor malice aforethought compels us to classify the object

23

of his conspiracy as a manslaughter." (*Horn, supra*, 12 Cal.3d at p. 299.)

On the record before us, no reasonable juror could have concluded Hughes conspired to commit manslaughter under a heat-of-passion theory. To prove the conspiracy counts, the prosecutor relied entirely on circumstantial evidence from which the jury could infer Hughes and the other defendants agreed to commit the murders. The record contains no direct evidence of those agreements; nor does it contain evidence from which the jury could determine, with any precision, when and where Defendants formed the agreements. Absent such evidence, it would be pure speculation to conclude Hughes was acting under the heat of passion when she agreed to kill Taylor and Reeves. Accordingly, the trial court was not required to instruct the jury on conspiracy to commit manslaughter.

e. *Attempted murders*

Hughes and Washington contend the trial court was required to instruct the jury on heat-of-passion attempted manslaughter related to their attempts to kill Miller, Taylor, and Reeves. Hughes, in particular, argues the jury could have convicted her of attempted manslaughter based on evidence showing the victims taunted her about her miscarriage, posted her address online, claimed credit for setting her car on fire, and challenged her to numerous fights. Washington similarly argues that "small disputes on Facebook led to online feuds between [the victims] and Hughes, endless challenges to fight, the burning of Hughes' car and a fight that caused Hughes to miscarry her and [Washington's] child. The feuds continued with even greater fervor after the miscarriage. [Washington] and Hughes both were taunted about the loss of their baby. Reeves told

24

[Washington] he would have no relationship [with] his child," and Taylor refused to allow him to spend time with his other child.

Assuming for the sake of argument the evidence satisfies the objective component of heat-of-passion manslaughter—which is far from certain—the trial court nevertheless properly declined to give the instruction because there is insufficient evidence of the subjective component. We discuss each attempted murder in turn.

i.    Hughes's attempt to kill Miller

As to the Miller shooting, Hughes did not testify at trial, so there is no direct evidence of her state of mind. The only indirect evidence shows she was calm and controlled throughout the incident. Miller, for example, testified Hughes followed her in a car for about a mile, pulled up beside her, and started shooting without saying a word. A short while later, Hughes returned to the area and silently made eye contact with Miller. On this record, no reasonable juror could have concluded Hughes shot at Miller while she was " 'so inflamed that . . . she would lose reason and judgment. . . .' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) The court, therefore, was not required to instruct on heat-of-passion manslaughter. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 585 (*Manriquez*) [court not required to give heat-of-passion instruction where there was no evidence the defendant exhibited anger, fury, or rage].)

ii.    Washington's attempt to kill Taylor

As to the Taylor shooting, Washington did not testify at trial, so there is no direct evidence of his state of mind during the incident. Nor is there indirect evidence showing he was under the influence of a strong passion as a result of Taylor's

25

provocation. To the contrary, Taylor's mother testified Washington was not upset or angry when Taylor refused to allow him to take his child earlier that day. Although a security guard testified Washington subsequently became "verbally aggressive" toward another man in the apartment's parking lot, there is nothing suggesting the altercation was in any way related to Taylor. (See *Lujan, supra*, 92 Cal.App.4th at pp. 1411–1412 [the provocation must be caused by the victim or reasonably believed by the accused to have been engaged in by the victim].) In any event, there is no evidence showing Washington was in the same emotional state when he shot Taylor. The evidence instead shows only that he pulled up next to Brejae's car, told her to pull over, and started firing in Taylor's direction when she refused. On this record, no reasonable juror could have concluded Washington was acting under the influence of a strong passion when he shot Taylor.

### iii. Hughes's and Washington's attempt to kill Reeves

As to the final incident, the case for a heat-of-passion instruction is somewhat stronger given the evidence that Reeves attempted to provoke Defendants immediately before the shooting by insulting Hughes and challenging her to fight. Nevertheless, as in the other incidents, there is no evidence that Reeves successfully induced a strong passion in either Washington or Hughes. As noted above, neither Washington nor and Hughes testified at trial, so there is no direct evidence of their states of mind during the shooting. Neither defendant, moreover, points to any indirect evidence even suggesting they were acting under the influence of intense emotion that obscured their reasoning or judgment. Absent such evidence, the court

26

was not required to give a heat-of-passion instruction. (See *Manriquez, supra*, 37 Cal.4th at p. 585.)

*People v. Bridgehouse* (1956) 47 Cal.2d 406, *People v. Borchers* (1958) 50 Cal.2d 321, and *People v. Berry* (1976) 18 Cal.3d 509, are distinguishable. In those cases, the defendants testified at trial, so there was direct evidence of their mental states. Moreover, the evidence showed that, near the time of the killings, the defendants were "mentally and emotionally exhausted and . . . white and shaking" (*Bridgehouse*, at p. 414), suicidal (*Borchers*, at p. 327), and in "a state of uncontrollable rage, completely under the sway of passion" (*Berry*, at p. 514). There is no comparable evidence in this case.

### iv. Any error was harmless

Even if the trial court should have instructed the jury on heat-of-passion attempted manslaughter, the error was harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [reversal is required unless the error was harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [reversal is required only if it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

"Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) In *People v. Wharton* (1991) 53 Cal.3d 522 (*Wharton*), for example, the California Supreme Court held a trial court's failure to instruct a jury that provocation can occur over a considerable period of time was

harmless where the jury found the defendant acted willfully, deliberately, and with premeditation. The court reasoned that such a "state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct . . . ." (*Id*. at p. 572.)

On the attempted murder counts in this case, the trial court instructed the jury that if it found Washington or Hughes guilty, it must decide whether they acted willfully, deliberately, and with premeditation. The court fully defined those terms and further instructed the jury that a "decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated."

In light of these instructions, the jury would have understood that the prosecution's burden to prove deliberation and premeditation included the burden to negate any reasonable doubt that Washington and Hughes acted rashly under any amount of provocation. The jury also would have understood that if the evidence showed Washington and Hughes did act rashly, they did not deliberate and premeditate. With respect to each attempted murder count, the jury found true that the crimes were committed with premeditation and deliberation. As in *Wharton*, "[t]his state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . and clearly demonstrates that defendant[s] [were] not prejudiced by the failure to give [their] requested instruction."[9] (*Wharton, supra*, 53 Cal.3d at p. 572; see *People*

---

[9] Because the jury found Hughes and Washington premeditated and deliberated the murder of Reeves's fetus,

*v. Wang* (2020) 46 Cal.App.5th 1055, 1071–1072; *People v. Franklin* (2018) 21 Cal.App.5th 881, 894–895; *People v. Peau* (2015) 236 Cal.App.4th 823, 831–832; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1246.)

Hughes suggests the jury's premeditation and deliberation findings are not definitive as to the Taylor and Reeves counts because the court instructed the jury that it could find the allegations true if "either the defendant[,] a principal[,] or both of them acted with that state of mind." Therefore, she argues, it is conceivable that the jury found the allegations true after concluding Washington or Grace acted with premeditation and deliberation, but she did not.

We are not persuaded. Based on the evidence adduced at trial, it is inconceivable that the jury could have concluded some, but not all, of the defendants acted with premeditation and deliberation. In any event, Hughes overlooks the fact that the jury also convicted her and Washington of conspiracy to murder each victim. On those counts, the trial court instructed the jury that, to convict Defendants, it had to find they (1) intended to agree intentionally and unlawfully to kill the victim and (2) intended that one of the alleged members of the conspiracy would intentionally and unlawfully kill the victim. In *Cortez, supra*, 18 Cal.4th 1223, the California Supreme Court held that this mental state "necessarily establishes premeditation and deliberation of the target offense of murder." (*Id*. at p. 1232.) The jury's guilty verdicts on the conspiracy counts, therefore, necessarily establish that Washington and Hughes acted with

any error in failing to instruct the jury on heat of passion related to that count was also necessarily harmless for the same reasons.

premeditation and deliberation when they agreed to kill Taylor and Reeves. Because there is no basis in the record to conclude the conspiracies to murder were separate from the attempts to murder, it is beyond a reasonable doubt that the jury found each defendant acted with premeditation and deliberation when they attempted to murder the victims. Accordingly, the court's failure to instruct on heat-of-passion attempted manslaughter was harmless.[10] (See *Wharton, supra*, 53 Cal.3d at p. 572.)

4. ***The trial court was not required to instruct the jury on provocation***

Washington and Hughes argue the trial court erred by failing to instruct the jury that provocation insufficient to reduce murder to manslaughter may nevertheless be relevant to show they did not act with premeditation and deliberation.

" 'Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of *both* premeditation *and* malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation.' " (*Wright, supra*, 242 Cal.App.4th at p. 1494.) "[A] subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was

---

[10] For the same reasons, we reject Hughes's derivative arguments that the trial court violated her constitutional rights by failing to instruct on heat of passion.

provoked." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000.) In other words, the evidence must show the provocation caused a heat of passion that precluded the defendant from subjectively deliberating or premeditating. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).)

At the outset, Washington and Hughes forfeited their arguments related to a provocation instruction. An instruction on provocation is a pinpoint instruction relating particular evidence to an element of the offense, meaning the court must give the instruction only if a party requests it. (*People v. Rogers* (2006) 39 Cal.4th 826, 878.) Although Defendants asked the court to instruct the jury "that provocation that doesn't justify manslaughter should reduce a first [to a] second," they did not specifically request that the court instruct the jury on provocation on the non-murder counts. Their failure to do so forfeits the issue on appeal as to those counts. (*People v. Jennings* (2010) 50 Cal.4th 616, 675 (*Jennings*).)

Washington and Hughes also forfeited the issue as it relates to the murder of Reeves's fetus, albeit for a different reason. "In order to preserve an issue for review, a [party] must not only request the court to act, but must press for a ruling. The failure to do so forfeits the claim." (*People v. Ramirez* (2006) 39 Cal.4th 398, 472.) Here, the trial court never expressly ruled on the request for an instruction related to the degree of murder; the court addressed only the request for a heat-of-passion manslaughter instruction. By failing to press the court for a ruling on provocation, Washington and Hughes forfeited the issue on appeal.

Even if we were to overlook the forfeiture, we would reject Washington's and Hughes's arguments on the merits.

As discussed above, there is not substantial evidence showing either defendant was acting under the heat of passion when they committed the charged crimes. Absent such evidence, the court was not required to instruct on provocation. (See *Hernandez, supra,* 183 Cal.App.4th at p. 1332 [the evidence must show the provocation caused the defendant to act under the heat of passion].)

In any event, any error in failing to give the instruction was harmless under the *Watson* standard.[11] (See *People v. Earp* (1999) 20 Cal.4th 826, 887 [the *Watson* harmless error standard applies when a court fails to give a requested pinpoint instruction].) Washington and Hughes were free to argue provocation to the jury, even without an instruction. Tellingly, neither did. Presumably, they recognized the evidence of premeditation and deliberation was overwhelming, particularly with respect to the counts related to Reeves and her fetus. Moreover, as discussed above, the jury also found Defendants conspired to murder Taylor and Reeves, which conclusively shows it determined Washington and Hughes did not act rashly or impulsively when they attempted to do so. On this record, it is not reasonably probable that Washington or Hughes would have obtained a more favorable result had the court given a provocation instruction. Accordingly, any error in failing to give the instruction was harmless.

---

[11] We reject Washington's and Hughes's cursory arguments that the errors are subject to the *Chapman* harmless error standard because they resulted in the violation of their federal constitutional rights.

32

**5.** ***The trial court did not abuse its discretion by failing to investigate potential juror bias***

Defendants contend the trial court erred by failing to conduct an investigation in response to a note from the jurors requesting security walk them to their cars. They insist the note indicates the jurors were biased because it shows they possessed a widespread and deep fear of retaliation by Defendants' associates.

a. *Background*

During deliberations on October 22, 2018, the jury submitted the following request to the court: "We the jury request our certificates ready + brought up to the jury room. May the jury leave our badges in the jury room, so we don't have to go down to the 2nd floor waiting room. The jury requests security walk us to our cars." The jury adjourned for the day about an hour and a half later. The record does not contain a response from the court or any substantive discussion of the note by the parties.

Ten minutes after resuming deliberations the next morning, the jury informed the court it had reached verdicts. Judge Connolly, who presided over the trial, was not available to take the verdicts, so Judge Ricardo Ocampo substituted in for him. Judge Ocampo reviewed the court's file and found several notes from the jury from the previous day. Judge Ocampo said one of the notes asked "to have [the jury's] certificates ready and brought up to the jury room." The prosecutor responded, "We all were aware of that, Your Honor." The parties then turned to other issues.

b. *Analysis*

" 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*People v. Osband* (1996) 13 Cal.4th 622, 675–676 (*Osband*).)

The note from the jury in this case did not provide the court with any information that, if proven to be true, would constitute good cause to doubt the jurors' ability to perform their duties or justify their removal from the case. The note itself does not reveal the reason the jurors requested security walk them to their cars; Defendants' insistence that the jurors were afraid of their associates is pure speculation. For all we know, the jurors made the request for reasons wholly unrelated to the case. Indeed, it is possible the request was a response to an earlier security incident involving at least two jurors, which had nothing to do with the trial.[12] It is also telling that, despite being aware

---

[12] The morning of September 7, 2018, the court stated on the record "there was an incident with the jury today, not in any relation to this trial at all." The court did not describe the incident in detail. It noted there was "something off with that person," and then apologized to the jury "that anything would happen in the courthouse." The court's minute order for that date states there "was an incident with Alternate Juror Number 3 [ ]. The Sheriff['s] Department is notified of incident.

of the jury's request, Defendants did not express any concern in the trial court that it signaled potential bias. On this record, Defendants have not met their burden of showing the trial court abused its discretion by failing to conduct an investigation into potential juror bias.[13] (See *People v. Manibusan* (2013) 58 Cal.4th 40, 53 (*Manibusan*) [note asking to change the foreperson did not constitute good cause to doubt the foreperson's ability to perform her duties because the note did not reveal the reason for the request].)

Even if we were to assume the note was related to the jurors' fear of Defendants' associates, the court still was not required to conduct an investigation. *People v. Panah* (2005) 35 Cal.4th 395 (*Panah*), is instructive. In that case, the defendant's supporters were " 'shadowing' " the jurors during breaks in deliberations. One of the jurors told the bailiff she felt intimidated by their presence, and another juror expressed relief when the jury was allowed to congregate in another area where they could avoid contact with the supporters. (*Id.* at p. 480.) The Supreme Court rejected the defendant's argument that this showed the jurors were biased, explaining, "What the record seems to indicate is spectator misconduct on the part of defendant's supporters who, intentionally or not, made

---

Deputy Delfin conducts an interview with Alternate Juror Number 3. Deputy Delfin also conducts an interview with Juror Number 11 [ ]. Juror Number 11 was a witness to incident that occurred involving Alternate Juror Number 3."

[13] For the same reasons, we reject Defendants' derivative arguments that the trial court's failure to conduct an investigation violated their federal constitutional rights.

themselves conspicuous to the jurors in a manner that some of the jurors interpreted as intimidating. The jurors' understandable concern does not amount to misconduct, and there is nothing on the record to support defendant's claim that he was denied an impartial jury." (*Ibid*.)

Under *Panah*, the fact that a juror feels intimidated by a defendant's supporters alone is not sufficient to show bias. (*Panah, supra*, 35 Cal.4th at p. 480.) Accordingly, even if the note in this case indicated the jurors were fearful of Defendants' associates, it did not provide good cause to doubt the jurors' ability to perform their duties or justify their removal from the case. The court, therefore, was not obligated to conduct an investigation. (*Osband, supra*, 13 Cal.4th at pp. 675–676.)

Defendants' reliance on *U.S. v. Johnson* (4th Cir. 2020) 954 F.3d 174 and *U.S. v. Angulo* (9th Cir. 1993) 4 F.3d 843, is misplaced. Those cases were premised on *Remmer v. United States* (1954) 347 U.S. 227, in which the United States Supreme Court held a district court must conduct an evidentiary hearing to determine prejudice whenever there has been a direct or indirect "private communication, contact, or tampering . . . with a juror during a trial about the matter pending before the jury." (*Id*. at pp. 229–230; see *Johnson*, at p. 176, *Angulo*, at pp. 846–848.) Here, there is nothing in the record even suggesting a "private communication, contact, or tampering" with any of the jurors. *Johnson* and *Angulo*, therefore, are inapposite.

**6.** ***The trial court did not prejudicially err by failing to instruct the jurors to start their deliberations anew***

Defendants argue the trial court erred by failing to instruct the jury to begin deliberations anew after replacing a juror with an alternate.[14]

a. *Background*

During a break in closing arguments, the court noted that Juror No. 12 had a preplanned vacation and would likely need to leave the case. At some point, the trial court and parties spoke to the juror and agreed she would be replaced after closing arguments.

During another break in closing arguments, the court told the jurors that after the prosecutor's rebuttal, it would give final instructions and then "ask you to start your deliberations." The parties finished their closing arguments the next day. The court read the final instructions, including the direction that "[w]hen you go into the jury room the first thing you should do is to choose a foreperson." The court also told the jurors most of the exhibits "will be sent into the jury room with you when you begin to deliberate." The clerk then swore

---

[14] In their opening briefs on appeal, Defendants asserted the court replaced two jurors during deliberations. Because the record was not clear whether the court replaced one or two jurors, we remanded the case to the trial court to clarify the record. On remand, the court clarified that it seated only a single alternate juror during deliberations. We subsequently invited the parties to submit supplemental briefs responding to the record on remand. In those supplemental briefs, Defendants seem to concede that the trial court seated only one alternate juror during deliberations. Accordingly, we do not consider their original arguments related to the second alternate juror.

the bailiff at the court's direction.  The court told the jurors to take their notebooks and go into the jury room, and it directed the alternates to step outside.

The reporter's transcript indicates that "at 12:15 p.m. the jurors exited the courtroom to begin deliberating."[15]  Almost immediately after the jurors and alternates left the courtroom, the court told the parties that it would excuse Juror No. 12 and seat Alternate Juror No. 1.  The parties and the court then discussed the verdict forms.

The reporter's transcript indicates the jurors and alternates returned to the courtroom at 12:30 p.m.  The court excused Juror No. 12 and told Alternate Juror No. 1 he was selected as the replacement.  The court and the jurors then agreed they could have a lunch break until 2:00 p.m.

Before excusing the jurors for lunch, the court directed them to "start your deliberations [after returning from lunch], and with the new Juror No. 12."  The court also informed the jurors they would have access to most of the evidence in the jury room, as well as a packet of jury instructions and verdict forms.  A minute order indicates the jurors returned from lunch and "commence[d] deliberations" at 2:05 p.m.

b.    *The court was not required to instruct the jurors to start deliberations anew*

Under section 1089, the court may, upon good cause, replace a discharged juror with an alternate.  If the court replaces a juror during deliberations, in order to comply with

_____

[15]    On remand, the parties stipulated that the court reporter generated the notation using an automated keystroke, which she triggers whenever a court instructs a jury to retire to the jury room after instructions.

38

the requirement of a unanimous verdict, the court must instruct the jurors to begin deliberations anew with the substituted juror. (*People v. Collins* (1976) 17 Cal.3d 687, 694 (*Collins*).)

Contrary to Defendants' claims, the court was not required to give such an instruction in this case. Under section 1128, the trial court "shall fix the time and place for deliberation," and the "jurors shall not deliberate on the case except under those circumstances." The record shows the court directed the original jurors to take their notebooks to the jury room at 12:15 p.m., but it did not instruct them to start deliberating at that time. The court brought the jurors back into the courtroom 15 minutes later, seated Alternate Juror No. 1, and then instructed the jurors to "start your deliberations" after returning from lunch.[16] Because the court seated the alternate juror before instructing the jurors to start their deliberations, there was no need to instruct the jurors to start their deliberations anew.

Defendants contend the reporter's transcript indicates the jurors started deliberating at 12:15 p.m., before the court seated the alternate juror. The notation in the reporter's transcript, however, is not determinative. It is undisputed that the court reporter generated the notation using an automated keystroke, which she triggers whenever a court instructs a jury to retire to the jury room after instructions. The notation does not reflect that that jurors actually started deliberating at that time.

Defendants alternatively contend it is likely the jurors believed they were supposed to start deliberating after entering

---

[16] Consistent with that direction, the court's minute order states the jurors "commence[d] deliberations" at 2:05 p.m. Subsequent minute orders, in contrast, state the jurors "resume[d] deliberations."

the jury room at 12:15 p.m., even though the court did not directly instruct them to do so.  In support, they point to the fact that, immediately before asking the jurors to enter the jury room, the court instructed them on the procedures for deliberations and directed the clerk to swear the bailiff.  Defendants also point out that the court directed the jurors to take their notebooks into the jury room, which it had previously told them they could do only while deliberating.  Defendants contend the jurors may have inferred from these circumstances that they were to begin deliberations as soon as they entered the jury room at 12:15 p.m.

Based on our review of the entire record, we do not think it is likely the jury started deliberating immediately at 12:15 p.m. The court had previously told the jurors it would "ask" them to start deliberating after giving final instructions; it also informed them the "exhibits will be sent into the jury room with you when you begin to deliberate."  The court, however, did not ask the jurors to start deliberating at 12:15 p.m., nor did it send the exhibits to the jury room with them at that time.  Moreover, when the jurors entered the jury room at 12:15 p.m., Juror No. 12 was already aware that she would be replaced by an alternate juror for deliberations.  It is highly unlikely the jurors would have begun deliberating under those circumstances.

We also reject Defendants' contention that we must presume the jurors started deliberating at 12:15 p.m. because the record does not show otherwise.  "[O]n appeal a judgment is presumed correct, and a party attacking the judgment, or any part of it, must affirmatively demonstrate prejudicial error." (*People v. Garza* (2005) 35 Cal.4th 866, 881.)  Accordingly, it is Defendants' burden to show the jury actually started deliberating

40

before the court seated the alternate juror.  If the record is silent or inconclusive on the issue, as it is here, we must affirm.

c. *The court's failure to instruct the jurors was harmless*

Even if the jurors had started deliberating at 12:15 p.m., any error in failing to instruct them properly after substitution of the alternate juror was harmless.

Initially, the parties dispute the proper standard of review. Defendants contend a court's failure to instruct a jury to begin deliberations anew is structural error and therefore not subject to harmless error review.  The Attorney General urges us instead to apply the *Watson* harmless error standard.  For the reasons discussed below, we reject both approaches and instead apply the federal *Chapman* harmless error standard.

"[S]tructural errors not susceptible to harmless error analysis are those that go to the very construction of the trial mechanism—a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element." (*People v. Gamache* (2010) 48 Cal.4th 347, 396 (*Gamache*).)  In *Weaver v. Massachusetts* (2017) 582 U.S. __ [137 S.Ct. 1899], the United States Supreme Court articulated three broad rationales for treating an error as structural:  "First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest. . . . [¶] Second, an error has been deemed structural if the effects of the error are simply too hard to measure. . . . [¶] Third, an error has been deemed structural if the error always results in fundamental unfairness. . . . It therefore would be futile for the government to try to show harmlessness."  (*Id*. at p. 1908; see *In re Christopher L.* (2022) 12 Cal.5th 1063, 1076–1077 [analyzing the *Weaver* rationales

41

to determine whether the failure to comply with a father's rights to presence and appointment of counsel at a child dependency hearing was structural error].)

None of these rationales applies when a trial court erroneously fails to instruct a jury to begin deliberations anew. As to the first rationale, the requirement that courts instruct jurors to begin deliberations anew arises out of a defendant's right to a unanimous verdict (see *Collins, supra* 17 Cal.3d at p. 694); that right plainly is designed to protect the defendant from erroneous convictions. As to the second rationale, this type of error is no harder to measure than other varieties of trial error. The California Supreme Court, in fact, has articulated factors that are relevant to the inquiry and concluded, on many occasions, that such errors were harmless. (See, e.g., *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 61; *People v. Proctor* (1992) 4 Cal.4th 499, 537 (*Proctor*); *People v. Odle* (1988) 45 Cal.3d 386, 405–406, abrogated on other grounds by *Ring v. Arizona* (2002) 536 U.S. 584, 609; *Collins*, at p. 697.) For the same reasons, it is apparent the third rationale—which asks whether the error results in fundamental unfairness in every case such that it would be futile for the government to try to show harmlessness— does not apply.

Defendants contend in passing that *Ramos v. Louisiana* (2020) __U.S. __ [140 S.Ct. 1390] (*Ramos*) renders a court's failure to instruct jurors to begin deliberations anew structural error. In *Ramos*, our nation's high court held the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally. (*Id*. at p. 1397.) *Ramos*, however, does not concern a trial court's failure to instruct jurors to start deliberations anew, nor did the high court hold that a violation

42

of the Sixth Amendment's unanimity requirement is structural error. Defendants, moreover, fail to explain how *Ramos* renders the type of error at issue in this case structural, rather than simply requiring application of the federal *Chapman* harmless error standard.

"There is a strong presumption that any error falls within the trial error category, and it will be the rare case where a constitutional violation will not be subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) This is not one of those rare cases.

We also reject the Attorney General's contention—based primarily on *Collins, supra*, 17 Cal.3d 687—that the state *Watson* standard applies to this type of error. In *Collins*, the California Supreme Court reviewed a trial court's failure to instruct jurors to begin deliberations anew under the *Watson* harmless error standard. (*Collins*, at p. 697.) The court declined to apply the federal *Chapman* harmless error standard because, at that time, the United States Supreme Court had ruled that the federal constitution does not require unanimous jury verdicts in state criminal trials. (*Collins*, at p. 692, fn. 3; see *Apodaca v. Oregon* (1972) 406 U.S. 404, 406.) Since *Collins*, however, the United States Supreme Court has held the Sixth Amendment's unanimity requirement applies to both state and federal criminal trials. (*Ramos, supra*, 140 S.Ct. at p. 1397.) A failure to instruct jurors to begin deliberations anew, therefore, now potentially violates a defendant's federal constitutional rights. Accordingly, we will apply the *Chapman* harmless error standard, which asks whether the error was harmless beyond a reasonable doubt. (See *Chapman, supra*, 386 U.S. at p. 24.)

In determining prejudice, we may consider "whether the case is a close one and compare the time the jury spent deliberating before and after the substitution of the alternate juror." (*Proctor*, *supra*, 4 Cal.4th at p. 537.) Here, the evidence against Defendants was strong. Assuming the jurors began their deliberations at 12:15 p.m., they would have deliberated for no more than 15 minutes before the court seated the alternate. It is highly doubtful that the jurors would have engaged in substantive discussions during that brief time, especially because the court instructed them to begin deliberations by selecting a foreperson. In contrast, after the court substituted Alternate Juror No. 1, the jury deliberated for roughly six hours. Under these circumstances, beyond a reasonable doubt, the outcome of the case would have been the same had the court instructed the jury to begin its deliberations anew. Any error, therefore, was harmless.

7.      ***The trial court did not err by admitting Grace's statements to the Perkins agent that implicated Washington and Hughes***

Washington and Hughes argue the trial court erred by admitting into evidence Grace's statements during the *Perkins* operation that implicated them in shooting Reeves and her fetus. They contend the statements are hearsay and do not fall within any exceptions to the hearsay rule. Alternatively, they contend the admission of the statements violated their constitutional rights under the *Aranda/Bruton*[17] doctrine.

---

[17]     *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

a.     *Grace's statements to the* Perkins *agent*

During the *Perkins* operation, Grace told the undercover agent he was from the Eight Tray Gangsters and the police arrested him for attempted murder. Grace implied he was at the scene of the crime, so he knew the police did not have a gun or a witness.

A police officer interrupted the conversation to collect a DNA sample from Grace. While doing so, the officer told Grace, "[T]he girl didn't die. The baby died, but she didn't, okay?" The officer also told Grace the police "got the car . . . we got your Facebook account, we got everything."

After the officer left, the agent told Grace other prisoners might be upset that he shot a woman and her child. Grace replied, "It was, it wasn't like, no. It was in, in the stomach type of shit actually." Grace said the victim was pregnant and then acknowledged that fact could "make it worse."

Grace implied Washington and Hughes were involved in the shooting and had already been booked "for another hot one type shit." Grace said Hughes and Reeves had a "hardcore beef" involving Washington. He also told the agent that Reeves was pregnant by "[his] boy."

The agent asked Grace, "[A]n argument happened, right? 'Cause I'm pretty sure a motherfucker just didn't roll up and pop her, right?" Grace replied, "Nah, like nah, it's—." Grace continued a few moments later, "Like, basically, like, you feel me, I put the whole play in motion type shit. But it happened, I, I put the whole play in motion. It was over the internet . . . ."

Grace expressed concern that his social media messages would implicate him in the crime. The agent suggested Grace could claim to have been trying to meet Reeves for some other

45

purpose, which Grace dismissed because "the timing gonna add up." Later, Grace agreed his messages would make it look like he "smooth talked" Reeves and "led her in for the kill."

Throughout the conversation, Grace repeatedly mentioned or implied that he was not the shooter. Grace said he would not reveal that information to police because then the charges would all fall on Washington. Grace asked the agent if he would "[have] a case to fight" if police found his DNA at the scene, but they could not place him behind the gun. The agent told Grace he did not actually have to pull the trigger to go down for the crime, and the police could charge him for telling the "trigger [ ] man" to "smoke that bitch." Grace responded, "Doing the same time." Later, he acknowledged the police were "gonna try to get me with conspiracy."

     b.    *Procedural background*

Before trial, Washington and Hughes sought to exclude portions of the recording that referred to them. Specifically, they argued Grace's statements implicating them in the crimes were inadmissible hearsay and violated their rights to confrontation. The court overruled the objections, finding the comments were admissible under the statements against penal interest exception to the hearsay rule. The court explained that, although "the argument can be made that [Grace] is trying to mitigate or exculpate himself—throughout this entire thing, I don't believe that he is trying to remove himself." The prosecutor subsequently played for the jury the entire recording of Grace's conversation with the agent, including the portions that referred to Washington and Hughes.

c.     *Statements against penal interest*

Washington and Hughes first argue the trial court erred in finding Grace's comments about them were admissible as statements against penal interest.

Under Evidence Code section 1230, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."  To gain admission of hearsay evidence under Evidence Code section 1230, " '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)  We review a trial court's admission of hearsay evidence under Evidence Code section 1230 for an abuse of discretion.  (*Ibid.*)

In *Grimes*, our Supreme Court clarified the long-standing rule that Evidence Code section 1230 does not allow the trial court to admit " 'any statement or portion of a statement not itself specifically disserving to the interests of the declarant.' " (*Grimes*, *supra*, 1 Cal.5th at p. 713, quoting *People v. Leach* (1975) 15 Cal.3d 419, 441.)  "[*Leach*] explained that those portions of a confession inculpating others are not as inherently trustworthy as those portions that are actually disserving to the declarant's interests." (*Grimes*, at p. 713.)  " '[T]he court may take into account not just the words but the circumstances

47

under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Id.* at p. 711.)

*Grimes* explained that California cases "have taken a contextual approach to the application of the *Leach* rule. We have applied *Leach* to bar admission of those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others. [Citations.] But we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Grimes*, *supra*, 1 Cal.5th at p. 715.) "[T]he nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' " (*Id.* at p. 716.) Noting that "context matters," the court concluded statements that "tended to underscore [the declarant's] responsibility for the crime, rather than diminish it," were admissible as declarations against interest. (*Id.* at p. 717.)

Here, Grace's comments implicating Washington and Hughes were inextricably tied to and part of specific statements against his penal interest. Grace admitted to the *Perkins* agent that he was at the scene of the shootings and "put the whole

48

play in motion," which implicated him in—among other crimes—conspiracy to murder Reeves. His comments regarding Washington and Hughes provided essential context for those admissions. They identified the members of the conspiracy, their respective roles, and Grace's motive for joining it. Moreover, to the extent Grace implied that Washington and Hughes shot Reeves, his comments were relevant to proving that a co-conspirator committed an overt act in furtherance of the conspiracy, which is a necessary element of the crime. (§ 184.)

Further, the context in which Grace made the comments concerning Washington and Hughes indicates they are reliable. Although Grace insisted he did not personally shoot the victims—thereby implying that Washington and Hughes were the shooters—he did so primarily while discussing the potential evidence that could be used against *him*. Grace was seeking the agent's informed opinion on the strength of the prosecution's case against him; he was not trying to shift the blame to others. Indeed, Grace told the agent he would not reveal to the police that he was not the shooter because it might implicate Washington. Grace also seemed to recognize that, regardless of whether he was the shooter, he was likely to be charged as a conspirator and could face the same prison sentence.

Considering all the circumstances, Grace's comments implicating Washington and Hughes were clearly against his own interest, such that a reasonable person in his position would not have made them unless he believed them to be true. The trial court, therefore, did not abuse its discretion by admitting them into evidence. (See *People v. Smith* (2017) 12 Cal.App.5th 766, 793 [a trial court properly admitted out-of-court statements by a co-defendant because there was "no way in which her statements

49

about being at the scene of the burglary, robbery and murder in which [the declarant] was a relatively lesser participant would make any sense without reference to the major actors"].)

d.      Aranda/Bruton *doctrine*

Washington and Hughes alternatively argue the admission of Grace's comments violated their constitutional rights under the *Aranda/Bruton* doctrine.

The *Aranda/Bruton* doctrine generally precludes admission of out-of-court statements by a non-testifying codefendant that implicate the defendant.  (*Gamache, supra,* 48 Cal.4th at pp. 378–379.)  Because the doctrine is grounded exclusively in the confrontation clause, it is limited to statements by a codefendant that are testimonial.  (*People v. Almeda* (2018) 19 Cal.App.5th 346, 362 (*Almeda*); *People v. Washington* (2017) 15 Cal.App.5th 19, 29 (*Washington*); *People v. Arceo* (2011) 195 Cal.App.4th 556, 575.)  In order to be testimonial, a statement "must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial."  (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

The *Aranda/Bruton* doctrine does not apply to Grace's comments implicating Washington and Hughes.  Although the *Perkins* agent received Grace's statements for possible use in a criminal trial, the record does not show Grace knew he was speaking with a police informant or otherwise anticipated his statements would be used in a later criminal prosecution. Accordingly, his statements were not testimonial, and their admission did not violate the *Aranda/Bruton* doctrine.  (See *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402 ["statements unwittingly made to an informant are not 'testimonial' within

the meaning of the confrontation clause"]; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 66–68 [statements to a jailhouse informant were not testimonial because the declarant did not know he was speaking to an informant or that his statements would be used in a prosecution]; *Almeda, supra,* 19 Cal.App.5th at pp. 362–363 [statements made unwittingly to a government informant are nontestimonial]; *Washington, supra,* 15 Cal.App.5th at p. 28 [same].)

8. ***We reverse Defendants' convictions for attempt to murder Reeves's fetus***

Defendants contend we must reverse their convictions for attempted murder of Reeves's fetus (count 13) given the jury also convicted them of murdering the fetus (count 6). The Attorney General concedes the issue, and we agree with the parties. A defendant may not be convicted of both a greater offense and its lesser included offense. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.) Attempted murder is a lesser included offense of murder. (*People v. Davidson* (2008) 159 Cal.App.4th 205, 210.) Defendants, therefore, could not be convicted of both the attempted murder and murder of the fetus. Accordingly, we reverse their convictions on count 13 for attempted murder.

9. ***Substantial evidence supports Washington's convictions for assaulting Clayton and Mercadale (counts 11 and 12)***

Washington contends there is insufficient evidence supporting his convictions for assaulting Clayton and Mercadale. He insists the evidence shows he targeted only Taylor, who was sitting in the front seat of Brejae's car. Therefore, he argues, there was no risk of harm to Clayton or Mercadale, who were sitting in the backseat.

51

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "Because the gravamen of assault is the *likelihood* that the defendant's action will result in a violent injury to another [citations], it follows that a victim of assault is one for whom such an injury was likely." (*People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1355.) "[W]hen the defendant shoots into a group of persons primarily targeting only one of them, the defendant can be convicted of assault with a deadly weapon as to the nontargeted members of the group." (*People v. Riva* (2003) 112 Cal.App.4th 981, 999 (*Riva*), disapproved on other grounds by *People v. Anderson* (2020) 9 Cal.5th 946, 955–957.)

Even assuming Washington intended to strike only Taylor, there is sufficient evidence that he had the present ability to commit a violent injury on Clayton and Mercadale, and such injuries were likely. The evidence shows Washington fired as many as seven shots in Taylor's direction. Although Taylor was initially in the front seat, she testified she tried to climb into the backseat after Washington fired the first shot. Because Clayton and Mercadale were in the backseat at the time, the jury reasonably could have concluded they were at substantial risk of being struck by a bullet directed at Taylor.

Even if Taylor had remained in the front seat, the jury reasonably could have concluded Washington fired the gun in such a way as to place Clayton and Mercadale at risk of harm. The evidence shows Washington fired the shots from one moving car into another. As Washington was shooting, Hughes—who was seated in the passenger seat—controlled the steering wheel and the car "wiggled." Taylor, moreover, testified Washington fired the gun seven times, yet there were only two bullet holes

in the side of Brejae's car; this suggests Washington missed the car entirely with five shots. From this evidence, the jury reasonably could have concluded Washington fired the gun wildly, making it likely he would strike everyone in Taylor's general vicinity, including Clayton and Mercadale. (See *Riva*, *supra*, 112 Cal.App.4th at p. 998 [finding a reasonable person would realize that firing a gun at a car could strike a nearby pedestrian].) Accordingly, substantial evidence supports his convictions for assaulting Clayton and Mercadale.[18]

**10.** ***The trial court did not err by instructing the jury with CALCRIM No. 875***

The trial court instructed the jury with CALCRIM No. 875 as follows:

> "To prove that the defendant is guilty of [assault], the People must prove that:
> 1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person;
> 2. The defendant did that act willfully;
> 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his . . . act by its nature would directly and probably result in the application of force to someone; AND

---

[18] We reject Washington's passing suggestion that Clayton and Mercadale cannot be victims of assault because there is no evidence showing either "was aware or placed in apprehension of being struck by a bullet." An assault does not require the victim be aware of the danger. (See § 240.)

53

> 4.  When the defendant acted, he . . . had the
>     present ability to apply force with a firearm
>     to a person."

Washington argues that, because the instruction did not specify which "person" must be subject to the application of force, it permitted the jury to convict him of assaulting Clayton and Mercadale based solely on a finding that Taylor was at risk of being struck by a bullet. He insists the trial court was required to modify the instruction to clarify that the jury had to find each named victim was subject to the application of force.

At the outset, Washington forfeited this issue by failing to raise it below. " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*Jennings, supra,* 50 Cal.4th at p. 671; see *People v. Lee* (2011) 51 Cal.4th 620, 638 ["failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"].) Washington concedes CALCRIM No. 875 is a correct statement of the law. As a result, his failure to request a clarifying instruction in the trial court forfeits the issue on appeal.

Even if we were to overlook the forfeiture, we would reject Washington's argument on the merits. Washington relies primarily on *People v. Velasquez* (2012) 211 Cal.App.4th 1170 (*Velasquez*), but that case is distinguishable. In *Velasquez,* the jury convicted the defendant of five counts of assault with a firearm based on evidence showing he fired ten shots at a garage. (*Id*. at pp. 1171, 1175.) At the time of the shooting, only one victim was in the garage; the other four were in the residence. (*Id*. at pp. 1172–1173.) The trial court instructed the

jury with CALCRIM No. 875, but it did not clarify that the jury had to conclude each victim was at risk of harm. (*Id*. at p. 1176.) The Court of Appeal reversed, explaining that because CALCRIM No. 875 states only that the jury must find a risk of harm to "a person," there was a reasonable risk the jury convicted the defendant of five counts of assault despite finding only the victim in the garage was at risk of harm. (*Id*. at p. 1177.)

Here, there was no similar risk. Unlike in *Velasquez*, the undisputed evidence shows all the victims were passengers in the same car and within close proximity of one another during the shooting. Considered with the undisputed evidence showing the other circumstances of the shooting—Washington fired multiple shots from one moving car into another while his passenger was steering his car—no juror could have reasonably concluded Washington placed Taylor, but not Clayton and Mercadale, at risk of harm. In other words, there is no significant risk that the jury convicted Washington of assaulting Clayton and Mercadale based solely on a finding that he placed Taylor at risk of harm. Accordingly, any ambiguity in CALCRIM No. 875 was harmless beyond a reasonable doubt. (See *Velasquez, supra*, 211 Cal.App.4th at p. 1177 [instructional error is subject to *Chapman* harmless error standard].)

**11.    *Substantial evidence supports Grace's convictions***

Grace contends there is insufficient evidence supporting his convictions for conspiracy and attempt to murder Reeves, murder of Reeves's fetus, and conspiracy to murder Taylor.

a.    *Standard of review*

In considering the sufficiency of evidence in a criminal appeal, we review the whole record in the light most favorable to the judgment to determine whether there is substantial

evidence—that is, evidence that is reasonable, credible, and of solid value—so that any rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Burton* (2006) 143 Cal.App.4th 447, 451 (*Burton*); *People v. Johnson* (1980) 26 Cal.3d 557, 578; *In re L.K.* (2011) 199 Cal.App.4th 1438, 1446.) We must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Johnson*, at p. 576; *L.K.*, at p. 1446.) " 'The same standard applies when the conviction rests primarily on circumstantial evidence.' " (*L.K.*, at p. 1446.) " ' "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]' [Citation.]" (*Manibusan, supra*, 58 Cal.4th at p. 87.)

      b.    *Relevant law*

      Murder is "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice can be either express or implied. It is express when the evidence shows a deliberate intention to kill, and it is implied when the defendant engages in conduct dangerous to human life, knows that the conduct endangers the victim's life, and acts with a conscious disregard for life. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act

56

toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.)

" 'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' [Citations.] Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117.) "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) "Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

"A conspiracy exists where two or more people agree to commit a crime, they specifically intend both to agree and to commit the crime, and one of them performs an overt act in furtherance of their agreement. (§§ 182, subd. (a)(1), 184.)" (*Kopp, supra*, 38 Cal.App.5th at p. 83.) "[T]he crime of conspiracy to commit murder requires a finding of unlawful intent to kill, i.e., express malice." (*Cortez, supra*, 18 Cal.4th at p. 1226.)

" 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged

57

conspirators before and during the alleged conspiracy." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 515–516.) The agreement element of conspiracy must often be proved circumstantially. (*People v. Homick* (2012) 55 Cal.4th 816, 870.) "While mere association does not prove a criminal conspiracy [citation], common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy." (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20.)

c.    *Conspiracy and attempt to murder Reeves*

Grace argues his convictions for conspiracy to murder and attempt to murder Reeves must be reversed because there is insufficient evidence showing he knew Washington and Hughes intended to kill Reeves and shared in that intention. He insists the evidence instead shows Washington and Hughes shot Reeves in response to a sudden argument, rather than a plan to ambush and kill her.

As Grace seems to concede, the record contains overwhelming evidence showing he formed a plan with Washington to lure Reeves to the location where Washington and Hughes shot her. Contrary to Grace's contentions, there is also ample evidence that he knew Washington and Hughes intended to kill Reeves at that location, and he shared in that intention.

On February 3, 2017, for example, Grace and Washington discussed over social media Grace's efforts to gain Reeves's trust and lure her out of hiding. Grace asked Washington, " [W]hat you want me to do?' " Washington replied, " 'Cap her or something,' " which meant "shoot her." Grace responded, " 'Owekilla,' " indicating he was in agreement.

Grace's statements to the *Perkins* agent provide additional support for a finding that he intended to kill Reeves. When the agent asked Grace if an argument happened immediately before Hughes and Washington shot Reeves, Grace responded, "[n]ah, like nah," which suggests they had planned the shooting in advance.[19] Grace also told the agent he "put the whole play in motion" with Reeves, and he acknowledged his social media messages would make it appear that he "led her in for the kill." Although Grace denied being the actual shooter, he never denied that the "whole play" included shooting and attempting to kill Reeves.

That Grace knew and shared Washington's and Hughes's murderous intentions is further supported by evidence showing he had witnessed the Taylor shooting just days earlier. Like Reeves, Taylor was Washington's ex-girlfriend and feuding with Hughes. Given these parallels, it is reasonable to infer Grace was aware Washington and Hughes intended something similar with Reeves. That Grace nevertheless continued to assist them indicates he shared in that intention.

Based on this evidence, the jury reasonably could have concluded Grace and Washington formed an agreement to kill Reeves, and both men committed numerous overt acts in furtherance of that agreement, including luring Reeves to 77th and Raymond, and shooting her several times. From

---

[19] Grace insists that when he said "[n]ah, like nah," he was responding to the agent's question, "[A] motherfucker just didn't roll up and pop her, right?" While that is certainly a reasonable interpretation, it is not the only one, and we must view the evidence in the light most favorable to the judgment. (*Burton, supra*, 143 Cal.App.4th at p. 451.)

the same evidence, the jury reasonably could have concluded Grace aided and abetted Washington's and Hughes's attempts to murder Reeves. Accordingly, substantial evidence supports his convictions for conspiracy to murder and attempt to murder Reeves.

      d.     *First degree murder of Reeves's fetus*

Grace argues there is no evidence—let alone substantial evidence—that he intended to kill Reeves's fetus or that he acted with premeditation and deliberation.

*People v. Bunyard* (1988) 45 Cal.3d 1189 (*Bunyard*)[20] is instructive on the issue. In that case, the defendant hired a friend to kill his pregnant wife, and the jury convicted him of first degree murder of the fetus. (*Id*. at p. 1200.) On appeal, the defendant argued there was insufficient evidence showing he harbored express malice toward the fetus. (*Id*. at p. 1213.) The Supreme Court disagreed, explaining that "because of the unique relationship between a mother and her unborn child, death of the fetus was certain and inevitable, not merely highly probable." (*Id*. at p. 1233.) Further, because the baby's birth was expected any day, had "defendant not intended to kill the fetus, it would have been easy enough to delay implementation of the plan until after the birth . . . ." (*Ibid*.)

Comparable evidence supports Grace's conviction for first degree murder of Reeves's fetus. As Grace concedes, the jury reasonably could have found he knew Reeves was pregnant when he lured her to 77th and Raymond. Moreover, as discussed above, there is substantial evidence that Grace knew Washington

---

[20]     Abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190–1191.

and Hughes intended to kill Reeves and shared in that intention. The jury reasonably could have inferred that, "because of the unique relationship between a mother and her unborn child," Grace knew it was "certain and inevitable" that killing Reeves would also kill her fetus. (*Bunyard, supra*, 45 Cal.3d at p. 1233.) Grace nevertheless went forward with the plan, rather than waiting until after Reeves gave birth. From this, the jury reasonably could have concluded Grace knew Washington and Hughes intended to kill both Reeves and her fetus, and he shared in that intention. For the same reasons, the jury could have relied on the evidence showing Grace premeditated and deliberated the attempted murder of Reeves—which was overwhelming—to find he also premeditated and deliberated the murder of the fetus.

Grace contends the jury could not have reasonably concluded he acted with premeditation and deliberation because there is no evidence showing he had animus toward the fetus, made specific plans to kill it, or instructed the other defendants to shoot Reeves in a way that would do so. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 [courts may look to evidence of planning activity, preexisting motive, and manner of killing to assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation].) Although this type of evidence is typically present in a premediated murder, its absence here is not definitive in light of the prosecution's theory that Grace aided and abetted the killing as a favor to Washington. If the jury accepted that theory —which finds ample support in the record—it is irrelevant that Grace did not have animus toward the fetus, have a specific plan for how to kill it, or direct the other defendants to do so.

61

     e.    *Conspiracy to murder Taylor*

Grace argues his conviction for conspiracy to murder Taylor must be reversed because there is no evidence showing he agreed to kill her.

The evidence shows the following:  Taylor was Washington's ex-girlfriend and feuding with Hughes on social media.  The day of the shooting, Washington, Grace, Hughes, and at least two other men drove to an apartment belonging to Taylor's mother, Octavia Neil, who was caring for Washington's child at the time.  Neil refused to give the child to Washington after she spoke to Taylor on the phone.

After Washington left Neil's apartment, he and Grace got into an argument with another man in the apartment's parking lot.  Washington was armed with a gun, and Grace made a motion to his waist suggesting he, too, was armed.  After a security guard told them he had called the police, Washington, Grace, and Hughes returned to Washington's car and drove away.

Around this time, Washington made several calls to Brejae, who was driving Taylor in her car.  Someone else called Brejae and sent Taylor a message asking, "[T]his you in front of us?" and " 'Is that you in the gray car?' "  Washington then pulled his car alongside Brejae's car, and one of his backseat passengers pointed a gun out the window.  Hughes told Washington to "shoot [them]," and Washington fired approximately seven shots in Taylor's direction.

From this evidence, the jury reasonably could have inferred that Washington left Neil's apartment intending to find and kill Taylor in retaliation for her refusal to allow him to spend time with his child.  The jury also reasonably could have inferred that all of the passengers in Washington's car, including Grace, knew

of his intentions and tacitly agreed to help him carry them out. The occupants clearly discussed Washington's plan ahead of time, as evidenced by the fact that a backseat passenger immediately pointed a gun at Brejae's car when Washington pulled alongside it. It is also reasonable to infer that Grace—who was Washington's friend and fellow gang member—shared Washington's murderous intentions. Indeed, at the time, Grace was actively helping Washington find and attempt to murder Storm Reeves, who, like Taylor, was Washington's ex-girlfriend and feuding with Hughes.

Grace posits various reasons why the evidence is insufficient to prove a conspiracy, none of which is persuasive. First, he contends his role in the Reeves shooting is irrelevant because there is no evidence that he knew Washington intended to kill her. Not so. As discussed above, several weeks before the Taylor shooting, Washington suggested Grace "cap" Reeves, to which Grace responded, " 'Owekilla.' " It is reasonable to infer from this exchange that, at the time of the Taylor shooting, Grace knew Washington wanted to kill Reeves and was actively helping him attempt to do so.

Grace next contends his gang affiliation alone is not sufficient to show he was part of a conspiracy with Washington. We agree. Grace's conspiracy conviction, however, is supported by more than just his gang affiliation. The fact that Grace was a member of the same gang as Washington simply helps explain why he would agree to murder Taylor, whom he otherwise had no apparent motive to kill.

Grace also argues there is insufficient evidence that he was armed during the confrontation with the resident in Neil's parking lot. Even if that were true, it is largely beside the point.

63

If Grace were armed, it would help show he and Washington intended to kill Taylor before going to Neil's apartment. However, as discussed above, the jury reasonably could have concluded they agreed to kill Taylor after Neil refused to allow Washington to take his child. If so, the fact that Grace was unarmed while at Neil's apartment is wholly irrelevant.

Next, Grace argues the jury could not have reasonably concluded he and Washington intended to kill Taylor when they left Neil's apartment because there is no evidence showing anyone in the group knew Taylor's location at the time. He insists it is pure coincidence that they came across Brejae's car, in which Taylor was a passenger. Grace, however, ignores phone records showing Washington made several calls to Brejae around the time he left Neil's apartment. Brejae clearly knew Taylor's location, as Taylor was a passenger in her car at the time. Taylor, moreover, told a detective she had an app on her phone that allowed others to track her location, which she believed Washington used to find her. While far from definitive, this is enough to reject Grace's claim that he and Washington had no way to locate Taylor.

We are similarly unpersuaded by Grace's contention that the circumstances of the shooting show Washington did not intend to kill Taylor. In support, Grace points to evidence that Washington fired as many as seven shots, but he struck Taylor only once in the buttocks. As we discussed above, the evidence also shows Washington fired the shots from one moving car into another, while his passenger controlled the steering wheel and his car "wiggled." Under these circumstances, it is not surprising that Washington may have missed his target with most of his shots.

64

Grace further contends the jury could not have reasonably inferred he was in the car during the shooting because the evidence shows Washington picked up passengers after leaving Neil's apartment. Although not entirely clear, we presume Grace is relying on the fact that Taylor told detectives Washington had at least five passengers in his car, whereas the surveillance video shows only four people with Washington at Neil's apartment. Grace, however, overlooks the possibility that another passenger was waiting outside the view of the surveillance camera. In any event, even if Washington picked up an additional passenger at some point, there is no reason to believe he would have dropped off Grace at the same time.

Grace also points to the lack of evidence that he aided and abetted the actual shooting as proof that he was not involved in a conspiracy. As Grace seems to concede, however, the prosecutor was not required to show he aided and abetted the actual shooting to prove a conspiracy. Although such evidence certainly would have provided further support for his conviction, it was not necessary. Accordingly, the lack of evidence that he aided and abetted the shooting does not require reversal of the conspiracy conviction.

Finally, Grace contends the fact that he did not admit his involvement in the Taylor shooting to the *Perkins* agent shows he was not involved. While perhaps helpful to Grace's case, the lack of an admission is far from definitive, especially considering Grace and the agent never directly discussed the circumstances of the Taylor shooting. Grace's argument, therefore, is nothing more than a veiled attempt to have us reweigh the evidence, which we refuse to do on appeal. (See *Jennings, supra,* 50

65

Cal.4th at p. 638 [the reviewing court does not reweigh the evidence when considering the sufficiency of the evidence].)

12. ***The trial court did not err by admitting evidence that Grace offered to plead guilty to shooting Reeves***

Grace contends the trial court erred by admitting into evidence his unsolicited comments that he wanted to plead guilty to "shooting" Reeves. He argues the comments were inadmissible because they were privileged, hearsay, and likely to confuse and mislead the jury. He also argues the admission of the evidence violated his federal constitutional right to due process.

a. *Background*

During a break in the trial, and outside the jury's presence, Grace made a comment that the court reporter did not transcribe. Grace's counsel responded, "I told him that's not going to happen." Grace then said, "I'll plead guilty to killing Storm [Reeves]—or shooting Storm." A few moments later, he reiterated, "I plead guilty to shooting Storm."

The court told Grace, "[T]he People have moved forward with the trial. All right. So as far as negotiations with the People, that time passed a long time ago. All right. If you were to plead open to the court, you would have to plead [to] everything. It's not a question of, hey, can I pick and choose what I plead to and how I plead to it." The court asked Grace if he wanted to speak with his counsel. Grace said no.

Washington told the court he intended to introduce Grace's statements into evidence, apparently to show that Grace —and not Washington—shot Reeves. Grace objected, arguing his statements were inadmissible as "an offer to the plea negotiations." His defense counsel explained that, before Grace made the comments, they had discussed the fact that under

66

the youthful-offender parole law, Grace would be eligible for parole after serving 25 years, no matter how long his term. Grace then told his counsel he was going to plead guilty to shooting Reeves, but not to the other charges.

The prosecutor initially indicated he also intended to present Grace's comments to the jury, which he believed were an attempt to take the fall for Washington. Later, the prosecutor apparently changed his mind and objected to their admission. The prosecutor expressed concern that the jury might be confused about Grace's motivations unless it learned about his discussions with counsel regarding the youthful-offender parole law. The prosecutor, however, did not ask the court to rule on that issue, and instead indicated he was simply "put[ting] that out there for a discussion point down the road . . . ." Grace did not comment on the issue.

The court overruled Grace's objection and concluded the comments were admissible as declarations against penal interest. By stipulation, the prosecutor read a transcript of the comments to the jury during his case-in-chief. The prosecutor argued in closing that after hearing the *Perkins* evidence played at trial, Grace recognized the jury was likely to convict him and he raised a "white flag." The prosecutor also argued Grace made the comments to help Washington, who, unlike Grace, was charged with personally using a firearm.

b.     *Grace's comments were not privileged*

Grace first argues the trial court erred in admitting his comments because they were privileged offers to plead guilty. Evidence Code section 1153 provides that "an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible . . . ." The purpose

67

of Evidence Code section 1153 is " 'to promote the public interest by encouraging the settlement of criminal cases without the necessity of a trial.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1404 (*Leonard*).)  In light of this purpose, "the statutory bar applies only to statements made in the context of bona fide plea negotiations." (*People v. Magana* (1993) 17 Cal.App.4th 1371, 1376.)

In *People v. Sirhan* (1972) 7 Cal.3d 710,[21] the defendant told the court during a break in trial that he wanted to plead guilty to first degree murder.  When the court asked him why, the defendant responded, " 'I killed [the victim] willfully, premeditatively, with twenty years of malice aforethought; that is why.' " (*Id*. at pp. 744–745.)  The Supreme Court held the comments were not privileged, explaining that "the Legislature intended to exclude solely withdrawn guilty pleas and *bona fide* offers to plead guilty and did not intend to exclude outbursts by an angry defendant during the trial even if accompanied by an expression of a desire to plead guilty.  Such outbursts, of course, would not lead to the settlement of the criminal case without a trial and ordinarily would not end the trial but instead would merely disrupt it.  Here it is apparent that [the defendant's] admission was made during such an outburst rather than during a bona fide offer to plead guilty." (*Id*. at pp. 745–746.)

The same is true here.  Taken literally, Grace's offer to plead guilty to "shooting" Reeves could not reasonably be construed as bona fide.  The prosecution's theory was that

---

[21]     Overruled on other grounds by *Hawkins v. Superior Court, Etc.* (1978) 22 Cal.3d 584, 593, fn. 7.

Washington and Hughes shot Reeves, and Grace acted as an aider and abettor. Consistent with that theory, the People alleged personal use firearm enhancement allegations against only Washington and Hughes. Grace could not "plead guilty" to a crime or enhancement with which he was not charged.

Even if we were to construe the comments as an offer to plead guilty as an aider and abettor, Grace has not shown they were privileged. Like the defendant in *Sirhan*, Grace made the unsolicited comments in the midst of trial and while there were no ongoing plea negotiations with the prosecution. Grace, moreover, did not ask for any concessions in return for his plea, which is a defining characteristic of a plea negotiation. Further, it is reasonable to infer from counsel's immediate response to Grace's initial outburst—"I told him that's not going to happen" —that counsel had informed Grace he could not plead guilty to a single count at that stage of the case. Excluding statements of this kind and under these circumstances would not encourage the settlement of criminal cases. The trial court, therefore, properly concluded the statements were not privileged under Evidence Code section 1153. (See *Leonard, supra*, 40 Cal.4th at p. 1404 [defendant's unsolicited statement "I am guilty" during a change of venue hearing was not privileged because there were no plea negotiations underway and excluding that type of statement would not encourage settlement]; *People v. Posten* (1980) 108 Cal.App.3d 633, 647–648 [defendant's offers to plead guilty made to police officers were not privileged because they were not made in the course of bona fide plea negotiations].)

Grace alternatively contends the trial court failed to make the ultimate determination of whether his comments were privileged, instead leaving the issue for the jury to decide.

In support, he points to two instances where the court noted "argument[s] could be made" that the statements were part of plea negotiations. The record does not support Grace's claim. It is clear from context the court was merely noting that Grace's privilege argument was colorable. The court did not instruct the jury on Evidence Code section 1153, nor did it instruct the jury to decide whether the comments were privileged. On this record, it is apparent the court did not submit the privilege issue to the jury.

       c.     *Grace's comments were not inadmissible hearsay*

Grace contends the trial court erred in finding his comments were admissible under the declarations against penal interest exception to the hearsay rule. He asserts his comments were not against his penal interest because the "very reason defendants make a plea offer and admit to some level of guilt is the hope of leniency or some other benefit compared to the alternative." Relatedly, he argues a guilty plea was in his interest because it would have allowed him to gain favor with Washington while giving up nothing in return.

As noted above, Evidence Code section 1230 provides an exception to the hearsay rule for an out-of-court statement that so far subjected the declarant to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true. (Evid. Code, § 1230.) We review a trial court's admission of hearsay evidence under Evidence Code section 1230 for an abuse of discretion. (*Grimes, supra*, 1 Cal.5th at p. 711.)

At the outset, Grace forfeited his arguments by failing to object to the evidence on this basis in the trial court. (See *People v. Stevens* (2015) 62 Cal.4th 325, 333 [the failure to object to

70

hearsay at trial forfeits an appellate claim that the evidence was improperly admitted].)  Although somewhat unclear, Grace seems to suggest he was not required to make an objection because the trial court overruled the prosecutor's objection on the same grounds.  The record belies this claim.  Contrary to Grace's contentions, the prosecutor actually suggested to the court that Grace's comments were declarations against penal interest; the prosecutor questioned only whether Grace was "unavailable" for purposes of the exception.  The court, therefore, never considered the arguments Grace now makes.  His failure to raise the issue below forfeits it on appeal.

Even if we were to overlook the forfeiture, we would reject Grace's arguments on the merits.  Although the court ruled that Washington could introduce the comments as statements against penal interest, the prosecutor ultimately introduced them during his case-in-chief.  Grace readily concedes the prosecutor was free to do so under the party admissions exception to the hearsay rule. (See Evid. Code, § 1220.)  Because the evidence was admissible on this basis, we must affirm, regardless of whether the trial court correctly found the comments were statements against penal interest.[22]  (See *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 [" 'we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm' "].)  In any event, contrary to Grace's contentions, "a guilty plea falls within the hearsay rule exception for declarations against penal interest." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1321,

---

[22]    We decline Grace's invitation to speculate as to whether the prosecutor would have introduced the comments had the court not ruled they were admissible as statements against penal interest.

71

abrogated on other grounds by *People v. Merritt* (2017) 2 Cal.5th 819, 821.)  Accordingly, there is no merit to Grace's claim that the trial court should have excluded the evidence under the hearsay rule.

        d.     *The evidence was not inadmissible under Evidence Code section 352*

Grace argues the trial court should have excluded his comments under Evidence Code section 352.  He contends there was a substantial risk that the evidence would confuse the issues or mislead the jurors given their unfamiliarity with the youthful-offender parole law.

Evidence is not inadmissible under Evidence Code section 352 unless the probative value is substantially outweighed by the probability of a substantial danger of confusing the issues or misleading the jury. (*People v. Fruits* (2016) 247 Cal.App.4th 188, 201, 205.)  We review a trial court's decision to admit evidence over an Evidence Code section 352 objection for abuse of discretion.  (*People v. Rocha* (2013) 221 Cal.App.4th 1385, 1397.)

Once again, Grace forfeited this issue by failing to raise it below.  (*People v. Valdez* (2012) 55 Cal.4th 82, 138.)  Grace did not object under Evidence Code section 352, nor did he seek to introduce evidence related to the youthful-offender parole law at trial.  Grace asserts he was not required to raise a specific Evidence Code section 352 objection because the trial court "recognized that all evidentiary objections encompassed a section 352 component."  It is true that the court made a comment to that effect while considering objections to voluminous social media documents.  Considered in context, however, it is apparent the court's comment was limited to those specific documents;

72

the court was not making a blanket ruling that every evidentiary objection in the entire case encompassed an Evidence Code section 352 component.

Even if we were to overlook the forfeiture, we would reject Grace's argument on the merits. According to Grace, knowledge of the youthful-offender parole law was necessary for the jury to understand how his offer to plead guilty could have helped Washington without harming himself in return. It is not apparent, and Grace does not meaningfully explain, why that would be so. Under the youthful-offender parole law, certain youthful offenders are eligible for parole after serving a set number of years, no matter how long their total sentences. (See § 3051.) When Grace made the comments, however, he had not yet been convicted of or sentenced for any crimes. Nor was it a foregone conclusion that he would be.

Even assuming Grace believed he would be convicted of the charges involving Reeves and her fetus, it is still not apparent how the jury's knowledge of the youthful-offender parole law would have benefited him. Grace, therefore, has not shown knowledge of the law was necessary for the jury to understand and evaluate the evidence. The court did not abuse its discretion by failing to exclude the evidence under Evidence Code section 352.

e.      *Due process*

Grace contends the admission of his comments violated his federal constitutional right to due process. We disagree. As discussed above, the trial court properly admitted the evidence under California law, and Grace fails meaningfully to explain how its admission otherwise rendered the trial fundamentally unfair such that it amounted to a violation of due process.

73

(See *People v. Boyette* (2002) 29 Cal.4th 381, 414 [generally, the ordinary rules of evidence do not impermissibly infringe on the accused's constitutional rights].)

13. ***We reverse the court's order that Grace pay victim restitution***

At Grace's sentencing, the trial court inadvertently failed to address the issue of direct victim restitution. At some point later that day, Grace's counsel represented to the court that Grace had agreed to pay $637.50 in victim restitution. The court then ordered he pay restitution in that amount.

Grace contends this was error because the record does not reflect that he was present when the court made the restitution order, or that he waived his presence. (See *People v. Nieves* (2021) 11 Cal.5th 404, 508 [a defendant has a constitutional right to be present at a restitution hearing].) The Attorney General concedes the error, which we accept. Accordingly, we reverse the restitution order and remand the case for the court to conduct further proceedings in accordance with this opinion.

14. ***We reject Hughes's arguments related to the firearm enhancement allegations***

As to Hughes, the jury found true several allegations that a principal discharged a firearm, which proximately caused great bodily injury or death "within the meaning of Penal Code section 12022.53[, subdivisions] (d) and (e)(1)." Section 12022.53, subdivision (d), provides a 25-year sentencing enhancement for a defendant who, in the commission of certain felonies, "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death . . . ." Section 12022.53, subdivision (e)(1) states the enhancement in subdivision (d) also applies to a person who is a "principal

74

in the commission of an offense," but only if (1) the person violated the gang enhancement statute (§ 186.22, subd. (b)); and (2) a principal in the offense committed an act specified in subdivision (d).

Hughes contends that, because the jury did not find she violated the gang enhancement statute, it did not find true all the elements required for an enhancement under section 12022.53, subdivision (e)(1). As a result, she argues, the true findings on allegations that reference section 12022.53, subdivision (e)(1) must be reversed. The Attorney General concedes the issue. We, however, find no error.

Contrary to Hughes's suggestions, the verdict forms did not ask the jury to decide whether she was subject to enhancements under section 12022.53, subdivision (e)(1). Instead, the forms asked the jury only to make one of the factual determinations necessary for the enhancements: that a principal discharged a firearm, which proximately caused great bodily injury or death. (See § 12022.53, subds. (d), (e)(1)(B).) The references in the verdict forms to section 12022.53, subdivision (e)(1) were superfluous, at least as far as the jury was concerned. The trial court, moreover, correctly declined to impose the enhancements on Hughes in light of the jury's failure to find she violated the gang enhancement statute. Accordingly, there is no error.

15. ***The court erroneously imposed a 25-year firearm enhancement on Hughes***

As to Hughes, the jury found the firearm enhancement allegations not true on count 5. Nevertheless, at sentencing, the court stated the jury found the allegations true, and it imposed a consecutive 25-year-to-life term. Hughes argues, and the Attorney General concedes, this was error. We agree.

We also agree with the parties that the proper remedy is to vacate Hughes's sentence and remand the case for resentencing.

**16.**    ***There is no cumulative error requiring reversal***

Defendants argue the cumulative effect of all the errors at trial requires reversal of their convictions. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068; accord, *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) After reviewing the entire record, we are satisfied that Defendants received a trial that was fair and comported with due process.

**17.**    ***The court must correct errors in Defendants' abstracts of judgment***

The jury convicted Defendants of first degree murder of Reeves's fetus in count 6. Defendants' abstracts of judgment, however, erroneously indicate the jury convicted them on count 6 of attempted murder of the fetus. On remand, the trial court shall correct these errors.

## DISPOSITION

As to Johnnie Lee Washington, we reverse his conviction for attempt to murder the fetus (count 13) and affirm his judgment in all other respects.

As to Aneesah Hughes, we reverse her conviction for attempt to murder the fetus (count 13) and vacate her sentence in light of the court's erroneous imposition of a 25-year firearm enhancement on count 5. We affirm her judgment in all other respects. On remand, the court shall resentence Hughes in accordance with this opinion.

76

As to Jarrett Grace, we reverse his conviction for attempt to murder the fetus (count 13) and reverse the victim restitution order.  We affirm his judgment in all other respects.  On remand, the trial court shall hold a hearing to reconsider the victim restitution issue.

For all three defendants, the trial court is to prepare amended abstracts of judgment and forward them to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



LAVIN, Acting P. J.



ADAMS, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.